APPEAL NO. 25-2162
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

ROGER LOPEZ,

*Plaintiff-Appellant,*

v.

CITY OF SAN DIEGO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:24-cv-01577-LL-DDL

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

Peter Breen
Michael McHale
Christopher J.F. Galiardo
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel.: (312) 782-1680
pbreen@thomasmoresociety.org
docketing@thomasmoresociety.org

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel.: (858) 759-9930
pjonna@limandri.com

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES .................................................... 2

PERTINENT STATUTES AND REGULATIONS ................................. 4

INTRODUCTION ........................................................................ 4

STATEMENT OF THE CASE ....................................................... 6

    A.   Lopez's Speech on the Sidewalk Outside Planned Parenthood. ....................................................................... 6

    B.   The San Diego Planned Parenthood Abortion Clinic. ................ 8

    C.   San Diego's Longstanding Attempts to Silence Pro-Life Speech. ........................................................................... 8

    D.   San Diego's Enactment Of The Ordinance. .............................. 9

SUMMARY OF ARGUMENT ..................................................... 14

STANDARD OF REVIEW .......................................................... 18

ARGUMENT ........................................................................... 19

    I.   The Ordinance Is Unconstitutionally Vague and Overbroad. ...................................................................... 19

        A.   "Harassment" and ill-defined "noise" are unduly vague. ....................................................................... 21

        B.   The harassment and noise provisions are overbroad. .......... 26

    II.   The Ordinance Is Not Narrowly Tailored as Required of Even Content-Neutral Restrictions. .......................................... 27

        A.   The ordinance's application to any health care facility, school grounds, or place or worship burdens substantially more speech than necessary. ......................... 28

        B.   The ordinance's overlapping restrictions also burden substantially more speech than necessary. ......................... 31

        C.   The record here is distinct from that in *Hill*. ..................... 34

    III.   The Ordinance Is Content-Based Even Under *Hill*. ................. 44

i

A. The exception for employees, agents, and volunteers is speaker-based discrimination, unlike in *McCullen*. ......... 45

B. The city's underlying viewpoint animus renders the bubble zone content-based. ...................................... 47

C. Restricting "offensive," "discomfort[ing]," and "annoy[ing]" noise is per se content-based. ........................... 50

IV. The District Court Erred in Applying *Hill*. ................. 51

A. The Supreme Court has abandoned *Hill*. ............... 53

B. The bubble zone is facially content-based. ........................ 57

C. The ordinance doesn't advance any government interest. .......................................................... 58

D. The ordinance is not narrowly tailored. ............................ 62

V. A Preliminary Injunction Should Issue. ..................... 67

CONCLUSION ................................................... 69

STATEMENT OF RELATED CASES ............................... 70

CERTIFICATE OF SERVICE .................................... 71

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton*, 521 U.S. 203 (1997).....................................................52

*Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024)............49

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................19

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) .........................................67

*Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) (en banc) .........64

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) .............................................54

*Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009).....16, 31, 32, 62

*Buck v. Bell*, 274 U.S. 200 (1927).............................................................54

*Butcher v. Knudsen*, 38 F.4th 1163 (9th Cir. 2022) ................................20

*Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647 (9th
    Cir. 2007) ............................................................................................29

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S.
    416 (1983)............................................................................................20

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ......................................20

*Coalition Life v. City of Carbondale*, 604 U.S. __, 145 S. Ct. 537,
    540 (2025) (Thomas, J., dissenting from denial of certiorari) .........3, 52

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ..................................24

*Colten v. Kentucky*, 407 U.S. 104 (1972)..................................................20

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ..3, 9, 37, 48

iii

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (Breyer, Sotomayor, and Kagan, JJ., dissenting)..............................................54

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ...........................................68

*Don Blythe v. City of San Diego*, No. 3:24-cv-2211, 2025 WL 1570528 (S.D. Cal. 2025)..............................................................29, 30

*Edge v. City of Everett*, 929 F.3d 657 (9th Cir. 2019)........................20, 24

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................68

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .....................20

*Frisby v. Schultz*, 487 U.S. 474 (1988)....................................................64

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)......................15, 22, 26

*Green v. Miss U.S.A., LLC*, 52 F.4th 773 (9th Cir. 2022) ......................62

*Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 835 (9th Cir. 2020)..............19

*Harman v. City of Santa Cruz*, 261 F. Supp. 3d 1041 (N.D. Cal. 2017)....................................................................................15, 25, 51

*Hill v. Colorado*, 530 U.S. 703 (2000) .............................................passim

*Hirabayashi v. United States*, 320 U.S. 81 (1943) ..................................54

*Hoke v. United States*, 227 U.S. 308 (1913)............................................54

*In Re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022)........................6

*Isaacson v. Mayes*, 84 F.4th 1089 (9th Cir. 2023) ..................................63

*Janus v. AFSCME*, 585 U.S. 878 (2018)..................................................55

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ..........................55

iv

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006).................................................................................68

*Kolender v. Lawson*, 461 U.S. 352 (1983) ...............................................19

*Korematsu v. United States*, 323 U.S. 214 (1944) ..................................55

*Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192 (9th Cir. 2016)....................................................................65

*Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753 (1994) ..............38, 41

*Marinello v. United States*, 584 U.S. 1 (2018) ........................................26

*Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024).........................20

*Mayfield v. City of Mesa*, 131 F.4th 1100  (9th Cir. 2025)...............19, 48

*McCullen v. Coakley*, 573 U.S. 464 (2014)...................................... passim

*McCullen v. Coakley*, 573 U.S. 464 (2014) (Scalia, J., concurring)..............................................................................23

*Minority Television Project, Inc. v. FCC*, 736 F.3d 1192 (9th Cir. 2013) (Kozinski, J., dissenting).............................................53

*Murphy v. Ramsey*, 114 U.S. 15 (1885)....................................................54

*Mut. Loan Co. v. Martell*, 222 U.S. 225 (1911)......................................54

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)....................................62

*Nat'l Inst. of Family & Life Advocs. ("NIFLA") v. Becerra*, 585 U.S. 755 (2018) .......................................................................45, 47

*Nken v. Holder*, 556 U.S. 418 (2009)........................................................67

*Palmer v. City of Euclid*, 402 U.S. 544 (1971)..................................15, 20

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ...............................................54

*Price v. City of Chicago*, 915 F.3d 1107 (7th Cir. 2019) .........................56

*Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025) (en
    banc) ............................................................................................49

*Ramos v. Louisiana*, 590 U.S. 83 (2020).................................................55

*Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025) .....................................19

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015) ............................66

*Roe v. Wade*, 410 U.S. 113 (1973) ..........................................................52

*Saia v. People of State of New York*, 334 U.S. 558 (1948)......................25

*Santa Monica Nativity Scenes Cmte. v. City of Santa Monica*,
    784 F.3d 1286 (9th Cir. 2015) ........................................................66

*Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997) 20, 38, 42,
    62

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400
    (6th Cir. 2022)........................................................................... passim

*Smith v. Goguen*, 415 U.S. 566 (1974).............................................15, 20

*Texas v. Johnson*, 491 U.S. 397 (1989) ...................................................51

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ..........................37

*Trump v. Hawaii*, 585 U.S. 667 (2018)....................................................55

*Tucson v. City of Seattle*, 91 F.4th 1318 (9th Cir. 2024) ........................20

*Twitter, Inc. v. Garland*, 61 F.4th 686 (9th Cir. 2023) ...........................62

*United States v. Hansen*, 599 U.S. 762 (2023)............................16, 21, 26

vi

*United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009) ............................22

*United States v. Vaello Madero*, 596 U.S. 159 (2022) (Gorsuch, J., concurring) ...................................................................................53

*United States v. Williams*, 302 U.S. 46 (1937) ....................................54

*Valenzuela Gallardo v. Lynch*, 818 F.3d 808 (9th Cir. 2016) .................22

*Vill. of Hoffman Ests. v. Flipside Hoffman Ests., Inc.*, 455 U.S. 489 (1974) ......................................................................................25

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980) .............................................................................................62

*Waln v. Dysart Sch. Dist.*, 54 F.4th 1152 (9th Cir. 2022) .......................19

*Watanabe v. Derr*, 115 F.4th 1034 (9th Cir. 2024) ...............................19

**Statutes**

18 U.S.C. § 248 ..............................................................................63, 64

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1292(a)(1) .........................................................................1

28 U.S.C. §1331 ...................................................................................1

42 U.S.C. §1983 ...................................................................................1

Cal. Const. § 1.1 ..................................................................................64

Cal. Pen. Code § 407 ...........................................................................63

Cal. Pen. Code § 409 ...........................................................................63

Cal. Pen. Code § 416(a) .......................................................................63

Cal. Pen. Code § 422 ...........................................................................64

vii

Cal. Pen. Code § 422.6 .................................................................. 64

Cal. Pen. Code § 422.7 .................................................................. 64

Cal. Pen. Code § 422.75 ................................................................ 64

Cal. Pen. Code § 423.2 .................................................................. 63

Cal. Pen. Code § 423.3 .................................................................. 63

Cal. Pen. Code § 602(o) ................................................................ 63

Colo. Rev. Stat. § 18-9-122 .......................................................... 40

Colo. Rev. Stat. § 18-9-122(3) ...................................................... 43

Fed. R. Civ. P. 12(b)(6) ................................................................... 6

San Diego Mun. Code § 52.1002 ......................................... passim

San Diego Mun. Code § 52.1003(b) ...................................... 14, 46

San Diego Mun. Code § 52.1003(b)(1) ................................. 23, 32

San Diego Mun. Code § 52.1003(b)(2) ................................. 23, 32

San Diego Mun. Code § 52.1003(b)(2) ........................................ 24

San Diego Mun. Code § 52.1003(c)(1) ........................................ 40

San Diego Mun. Code § 52.1004(a)(1) ................................. 14, 24

San Diego Mun. Code § 56.27 .................................................... 63

San Diego Mun. Code § 82.29 .................................................... 63

## Other Authorities

Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747
    (1999) ...................................................................................... 54

Amy Coney Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921 (2019) ....................................................................53

Brief for NARAL, et al. as Amici Curiae Supporting Respondents, Hill v. Colorado, 530 U.S. 703 (2000) (No. 98-1856), 1999 WL 1186249 .......................................................................40

Brief in Opposition to Petition for Writ of Certiorari, Hill v. Colorado, 530 U.S. 703 (2000) (No. 98- 1856) ("*Hill* BIO")..................40

C. Brennan, *Abortion Foe Skips Confrontation*, Rocky Mtn. News (Jan. 3, 1986) ..................................................................34

C. Brennan, *Anti-Abortion Leader Targets Boulder Clinic*, Rocky Mtn. News (Oct. 22, 1985)........................................................34

Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315 (2000)...................................................................................26

Joint App'x, *Hill v. Colorado*, 530 U.S. 703 (2000) (No. 98-1856), 1999 WL 33612749 .............................................................34, 35, 38

Note, *Too Close for Comfort: Protesting Outside Medical Facilities*, 101 Harv. L. Rev. 1856 (1988) .............................................35

Planned Parenthood Pac. Sw., *FY2024 Impact Report: Patient Services* (2025) .....................................................................36

Richard M. Re, Essay, *Narrowing Precedent in the Supreme Court*, 114 Colum. L. Rev. 1861 (2014)..............................................54

Transcript of Oral Argument at 30, *Hill v. Colorado*, 530 U.S. 703 (2000) (No. 98-1856) .................................................39, 41

William Shakespeare, Macbeth act 5, sc. 5, l. 31 ...................................26

## STATEMENT OF JURISDICTION

Roger Lopez ("Lopez") filed this lawsuit against the City of San Diego (the "City" or "San Diego") in the United States District Court for the Southern District of California pursuant to 42 U.S.C. §1983. He alleged violations of his First and Fourteenth Amendment rights. The district court exercised federal-question jurisdiction over Lopez's claims pursuant to 28 U.S.C. §1331.

On March 21, 2025, the district court entered a final order granting the City's motion to dismiss, without leave to amend, and denying Lopez's motion for preliminary injunction as moot. 1-ER-2. On April 3, 2025, Lopez timely filed his notice of appeal from the district court's March 21, 2025 final order. 3-ER-397. This Court has jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 1292(a)(1).

1

# STATEMENT OF THE ISSUES

1. Whether the district court properly dismissed Lopez's First and Fourteenth Amendment claims against enforcement of ordinance O-21822 (2024), which restricts speech on public sidewalks within 100 feet of every health care facility, school ground, and place of worship in San Diego. In particular:

A. Whether the ordinance's restrictions on "harassment" and "offensive noise" are unconstitutionally vague and overbroad.

B. Whether the ordinance's restrictions satisfy the narrow tailoring required of even content-neutral laws. Specifically:

(i) Whether the challenged restrictions burden substantially more speech than necessary to further any legitimate government interest where they apply to every health care facility, school ground, and place of worship in San Diego;

(ii) Whether the *combined effect* of the challenged restrictions burdens substantially more speech than necessary; and

(iii) Whether the 8-foot bubble zone here is not predicated on the kinds of problems that justified the 8-foot zone upheld in *Hill v. Colorado*;

C. Whether the ordinance is content based because: (1) the

exception for clinic employees, agents, and volunteers facially discriminates based on speaker; (2) its 8-foot bubble restriction was adopted for a viewpoint discriminatory purpose; and (3) its restriction on "offensive noise" hinges on listener reaction; and

D. Whether the ordinance's 8-foot bubble restriction is content discriminatory on its face and must be declared unconstitutional under *Reed v. Town of Gilbert* and *McCullen v. Coakley*, because *Hill v. Colorado* is not good law, in view of the Supreme Court's subsequent decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and Justice Thomas's dissent in *Coalition Life v. City of Carbondale*, 604 U.S. __, 145 S. Ct. 537 (2025) (mem.) (Thomas, J., dissenting).

2. Whether the district court properly denied Lopez's motion for preliminary injunction as moot, including:

A. Whether Lopez is entitled to a preliminary injunction given the likelihood of success on the merits of his First Amendment claims;

B. Alternatively, whether this Court should remand for reconsideration of Lopez's motion for preliminary injunction.

3

## PERTINENT STATUTES AND REGULATIONS

Pertinent constitutional provisions, statutes, regulations, and rules are included in the Appendix hereto.

## INTRODUCTION

Lopez quietly prays on the public sidewalk near San Diego's downtown abortion clinic about 20-25 hours each month. 3-ER-344; 3-ER-347. This retired grandfather offers a smile and a shoulder to cry on, along with offers of practical assistance to women who enter and leave the clinic. *Id.*

Lopez waves to these women and approaches just close enough so that his greetings can be heard over ambient car and air traffic noise. 2-ER-188; 3-ER-341. If women do not care to speak with him, he returns to his prayers. 3-ER-344; 3-ER-347. Alternatively, if a woman indicates interest, he shares leaflets about free resources available to her. 3-ER-347; 3-ER-382-388.

There is no substantiated evidence that during the last 30 years any sidewalk counselors at that location have engaged in improper conduct, acted improperly toward anyone, or blocked a clinic entrance. 2-ER-110-113; 2-ER-199-201; 3-ER-353-356. Nonetheless, the city attorney

4

and city councilmembers advanced what became the ordinance at issue here, which restricts pro-life speech on the public sidewalks in front of San Diego's abortion clinics. As discussed *infra*, there is evidence that viewpoint animus motivated the enactment of the ordinance, but none suggesting any justification based on the conduct of peaceful pro-life advocates like Lopez.

Even if a speech ban motivated by viewpoint discrimination could ever be deemed content-neutral (precedent says it cannot), the municipal ordinance at issue here could survive regular constitutional scrutiny only if it narrowly advanced a significant government interest. The city concedes it does not. Instead, it incorrectly but successfully argued before the district court that the ordinance's superficial similarity to the statute at issue in *Hill v. Colorado*, 530 U.S. 703 (2000)*, was dispositive*—that *Hill* gives the city broad latitude to restrict speech in a variety of ways, across a vast swath of the city, merely because the ordinance also includes 8-foot anti-speech bubble zones. That claim defies longstanding precedent, but the district court nonetheless embraced that position in dismissing Lopez's complaint without leave to amend. This Court should reverse.

## STATEMENT OF THE CASE

Because this is an appeal from the dismissal, with prejudice, of Plaintiff's Verified Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), this Court "accept[s] all nonconclusory facts alleged in the complaint as true and determine[s] whether those allegations 'plausibly give rise to an entitlement to relief.'" *In Re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*, 28 F.4th 42, 45 (9th Cir. 2022) (citing quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## A. Lopez's Speech on the Sidewalk Outside Planned Parenthood.

Many women choose abortion only because they lack social support and the financial means to care for a child. 3-ER-346; *see* Diane Greene Foster, et al., *The Turnaway Study* 34-35 & tbl.1 (2021). Sidewalk counseling arose about four decades ago to help meet those needs and is vital to the pro-life movement. 3-ER-346. Counselors stand on public sidewalks near abortion clinics, where they quietly pray and engage pregnant passersby and their companions in conversation. 3-ER-346. They listen to women's stories, acknowledge the difficulty of their circumstances, and offer to connect them with nonprofits ready to give them free material and material support (including after their babies are born) so that they

6

can make reproductive choices not compelled by material need. 3-ER-346.

For more than 22,000 women who have talked with sidewalk counselors, those interactions have allowed them the free choice to forgo an abortion they had planned, in favor of childbirth. 3-ER-346. And after interacting with those counselors, over 640 clinic employees have left their jobs. 3-ER-346-347. Those "saves" and employee decisions to quit have cost abortion clinics millions of dollars in revenue. 3-ER-346-347.

Lopez and his late wife began to pray and to offer peaceful sidewalk counseling outside the downtown San Diego Planned Parenthood abortion clinic decades ago while raising their four children. 3-ER-344; 3-ER-347. After Lopez's wife died, he continued to pray and counsel there in her memory. 3-ER-344. For the last approximately five years, he has counseled there 2-3 hours a day, twice a week. 3-ER-344; 3-ER-347.

Lopez is one of those counselors whose only chance to directly help abortion-minded women is on the public sidewalk. 3-ER-347. He has never badgered a patient or had a run in with a clinic employee or volunteer. 3-ER-347. More than 100 women have chosen life after talking with Lopez over the past 15 years he has counseled in front of the downtown

7

Planned Parenthood. 3-ER-347.

**B.    The San Diego Planned Parenthood Abortion Clinic.**

The record as it stands is devoid of any negative interactions involving any of the sidewalk counselors, like Lopez—on the sidewalk outside of the downtown San Diego Planned Parenthood.

**C.    San Diego's Longstanding Attempts to Silence Pro-Life Speech.**

Despite its "special position in terms of First Amendment protection," see 3-ER-348 (citing *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)), Planned Parenthood has worked with allies in local government for years to silence sidewalk counselors as much as possible, including through suppressing sidewalk counselors' speech by drawing speech-free "bubble zones" around pedestrians and motor vehicle occupants passing outside clinics. 3-ER-346-347. The bubble zones inhibit counselors' ability to have the quiet personal interactions that allow them to effectively engage in sidewalk counseling. 3-ER-347. Few have any alternative means of sharing their message with women in need. 3-ER-347.

The bubble zones are just the most recent permutation of San Diego's efforts to silence pro-life speech. San Diego has historically targeted pro-life speech. 3-ER-348-349. For example, in the 1990s, the city council

8

enacted ordinances targeting only pro-life speech by both requiring pro-life advocates to obtain permits from the pro-choice mayor to speak on public ways and then segregating them behind chain link when they were granted leave to speak. 3-ER-348-349. By contrast, San Diego has historically favored other types of even contentious sidewalk speech, including street vending and anti-police protests. 3-ER-348. With respect to other kinds of speech, the city has recognized "it is vital to our democracy to allow free speech for all, even those with whom we vehemently disagree." 3-ER-348.

## D.     San Diego's Enactment Of The Ordinance.

At the end of February 2024, City Attorney Mara Elliott ("Elliott") held a press conference at which she denounced the Supreme Court's decision in *Dobbs v. Jackson Women's Health Center* and promised amendments to the municipal code to suppress pro-life speech. 3-ER-349. Elliott's deputy city attorney (and successor as current city attorney) Heather Ferbert subsequently led a joint effort between the City Attorney's Office and outside abortion activists to decide what those amendments would be and to draft an ordinance to propose to the city council

to effect the amendments. 3-ER-349-350.

Even though the City Attorney's Office had previously maintained for more than a quarter century that "bubble zones" that float around passersby and motor vehicles are unconstitutional, 3-ER-350, Elliott presented a proposed ordinance for a vote at the city council's May 21 public meeting that imposed floating 8-foot bubble zones within 100 feet of the entrances and exits to all "health care facilities," "places of worship," and "school grounds." 3-ER-353-354; 3-ER-375-378. But among the covered facilities, only abortion clinics see regular protests. 3-ER-350.

The proposed ordinance, which was subsequently adopted without amendment, 3-ER-353, provides that, within a 100-foot buffer zone around a covered facility's main entrance door or main entry gate, no person may "knowingly and willfully approach" within an 8-foot floating bubble around a passerby or motor vehicle "on the sidewalk or any other public right-of-way who is seeking to enter or exit a covered facility without first receiving express consent to: (i) pass a leaflet or handbill to that person; (ii) display a sign to that person; or (iii) engage in oral protest, education, or counseling." 3-ER-350.

The ordinance imposes not only an 8-foot bubble but also a noise

10

restriction in the covered 100-foot buffer zones where no one may make (1) "any disturbing, excessive, or offensive noise which causes discomfort or annoyance to any reasonable person of normal sensitivities"; or (2) "any noise which unreasonably interferes with the workings of" a covered facility; or (3) "use loud speaking amplifiers or similar devices in a manner that emits a sound level exceeding 55 decibels at any point ten feet or more from the noise source." 3-ER-351; 3-ER-377.

A sound registering 55 decibels is about 35% as loud as a normal conversation with a nearby person. 3-ER-351. But the clinic sits off the intersection of two roads typically two to four times that loud. 3-ER-356. And it is situated deep inside San Diego International Airport's noise abatement zone—on a 70-decibel approach route so loud the FAA pays for building soundproofing. 3-ER-356; 3-ER-391-394.

Further, the ordinance prohibits any act to "harass or intimidate" a passerby or motor vehicle occupant within the 100-foot buffer zone. 3-ER-351; 3-ER-375. At section 52.1002, the ordinance defines "harass" and "harassment" as meaning:

> [E]ngaging in knowing and willful actions or course of conduct directed at a specific person or persons that would seriously alarm or aggravate, cause substantial distress to, *intimidate*, terrorize, threaten, or torment a reasonable person.

11

> Harassment does not include consensual conversations or displaying a sign from more than eight feet away from a person or persons. Harassment includes approaching or following a person with the intent to harass once the person has indicated they do not want to be approached or followed; intentionally touching or causing physical contact with a person without that person's consent; and using violent or threatening gestures toward a person.

3-ER-351-352; 3-ER-373.

The ordinance thus implies that displaying a sign *within* 8 feet of another can constitute harassment. And it nowhere defines what an "indicat[ion]" by another means. It defines "intimidate" as "use of credible threats of violence, oppression, or coercion with the intent to prevent a person from accessing" a covered facility or its parking lot. 3-ER-352; 3-ER-373.

Moreover, employees and volunteers of San Diego's health care facilities, places of worship, or schools—including the "clinic escorts" deployed against sidewalk counselors by Planned Parenthood—may violate the various provisions of the speech ban with impunity, as long as they do so "within the scope of their employment." 3-ER-350; 3-ER-376.

Practically, the ordinance creates zones where all pro-life speech is prohibited for three reasons. First, the ordinance creates a 100-foot zone around the main entrance or entry gate to any covered facility, inside

12

which no one may approach within 8 feet of a passerby or motor vehicle to converse, display a sign, or leaflet without express permission. 3-ER-353. Second, because counselors may not use any device that amplifies their voice above the loudness of an average home refrigerator, 3-ER-353, it forces a counselor to shout requests for permission in order to be heard above ambient noise and overhead jets—which could be "offensive" and "alarm" a person or cause the very "discomfort or annoyance" the ordinance elsewhere forbids. 3-ER-353. Third, it broadly prohibits any speech that might "harass" a passerby, but as discussed *infra*, the operative terms of this provision are effectively indecipherable. 3-ER-353.

Any purported violation makes the speaker liable for onerous damages, penalties, and attorneys' fees and months behind bars. 3-ER-352-353. The ordinance allows any person "aggrieved by" a prohibited act—including the covered facilities themselves—to "bring an action for damages, injunctive or [sic] declaratory relief." 3-ER-352; 3-ER-378. "Any aggrieved person who prevails in" the permitted action furthermore "shall be entitled to recover from the violator those damages, costs, attorneys' fees and such other relief as determined by the court." 3-ER-352; 3-ER-378. The court additionally "may award to the aggrieved person a civil

13

penalty of up to $2,500 for each violation." 3-ER-352; 3-ER-378. A first conviction for violating any of the abovementioned provisions is punishable by a fine of up to $500 and imprisonment for up to three months. 3-ER-352; 3-ER-378. A second conviction or subsequent conviction is then punishable by a fine of up to $1,000 and imprisonment for up to six months. 3-ER-352; 3-ER-378-379.

After passage of the ordinance Lopez and other sidewalk counselors began to self-censor to avoid the risk of heavy damages, penalties, fees, and prison time for peaceably speaking in a public place. 3-ER-341-342; 3-ER-357-358.

## SUMMARY OF ARGUMENT

The ordinance's challenged provisions violate bedrock protections of the First and Fourteenth Amendments.

1. The ordinance's restrictions on "harassment" (§ 52.1003(b)) and "offensive noise" (§ 52.1004(a)(1)) are both unconstitutionally vague and overbroad. The definition of "harassment" fails to provide fair notice and objective enforcement standards for what constitutes conduct "that would seriously alarm or aggravate" or "cause substantial distress to" a reasonable person in this sensitive First Amendment context, particularly

under the more stringent due process requirements for laws that criminalize speech. *See Smith v. Goguen*, 415 U.S. 566, 573 & n.10 (1974) & *Palmer v. City of Euclid*, 402 U.S. 544, 545- 46 (1971). The same is true of the restriction on approaching another with intent to harass "once the person has *indicated* they do not want to be approached." The ordinance provides no criteria for what constitutes such "indicat[ion]," thus creating the kind of gray zone that leads reasonable speakers to steer far wider of the unlawful line. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). So too for the ordinance's implication that displaying a sign *within* 8 feet of another can be harassment, particularly given the restriction on *stationary* harassment at § 52.1003(b)(2).

The restriction on "offensive noise" that "causes discomfort or annoyance" to reasonable person contains similar defects. No standard is specified for any of these terms, thus failing to provide adequate notice or sufficient limitation on enforcement discretion to avoid unduly chilling protected speech. *See Harman v. City of Santa Cruz*, 261 F. Supp. 3d 1041, 1044 (N.D. Cal. 2017) (emphasis added).

The "harassment" and "offensive noise" restrictions are overbroad for similar reasons, given their prohibition of a substantial amount of

15

protected speech relative to any legitimate sweep. *United States v. Hansen*, 599 U.S. 762 (2023).

2. The ordinance's restrictions on "harassment," "offensive noise," and approaching within 8-feet of another to engage in sidewalk counseling are not narrowly tailored, thus violating the intermediate scrutiny required of even content-neutral restrictions on speech in traditional public fora.

The challenged provisions each apply within 100 feet of every health care facility, school ground, and place of worship of across San Diego—thereby burdening substantially more speech than necessary to further any legitimate interest in protecting access to such facilities. *McCullen v. Coakley*, 573 U.S. 464, 485 (2014). There is no evidence of such a widespread problem. The ordinance thus lacks narrow tailoring on its face and must be invalidated for this reason alone. *See Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 405 (6th Cir. 2022).

The combined effect of the challenged restrictions likewise burdens substantially more speech than necessary and therefore requires enjoining at least *some* of these restrictions. *See Brown v. City of Pittsburgh*,

16

586 F.3d 263 (3d Cir. 2009).

The 8-foot bubble zone by itself also burdens substantially more speech than necessary because, unlike the 8-foot zone upheld in *Hill v. Colorado*, it was adopted as an alleged remedy for significantly less volatile local conditions in San Diego, without attempting less restrictive alternatives. The 8-foot zone is thus vastly out of step with the First Amendment's "touchstone" narrow tailoring requirement for specially protected speech in public fora.

3. The ordinance is content-based even under *Hill v. Colorado* because (a) the ordinance's exemption for clinic workers acting within the scope of their employment facially exempts them from restrictions on *speaking*, unlike an otherwise similarly worded exemption in *McCullen*, and thus raises the specter of speaker-based viewpoint discrimination; (b) the bubble zone here was adopted for a viewpoint discriminatory purpose, unlike the zone upheld in *Hill*; and (c) the restriction on "offensive noise" inherently turns on listener reaction, which is not a content-neutral restriction on speech. *McCullen*, 573 U.S. at 481.

4. The bubble zone is content discriminatory on its face under post-*Hill* Supreme Court precedents, and this Court should recognize that *Hill*

17

has been effectively overruled. The Supreme Court's decision in *Dobbs* declared that *Hill* "distorted First Amendment doctrines," and Justice Thomas recently opined that as a result, lower courts should no longer feel "compelled to uphold *Hill*-like buffer zones around abortion clinics." *Coalition Life*, 145 S. Ct. at 540 (Thomas, J., dissenting from denial of certiorari). With *Hill* abandoned, the bubble zone facially discriminates against speech based on its "function or purpose" and requires enforcement authorities to evaluate the substantive content of a speaker's message—both hallmarks of content-based discrimination. The bubble zone must undergo strict scrutiny, which it easily fails.

5. For the foregoing reasons, the district court's denial of Lopez's motion for preliminary injunction as moot was also erroneous. Given Lopez's likelihood of success on the merits as a matter of law on his First Amendment claims, he is suffering ongoing irreparable harm and the public interest favors a preliminary injunction. This Court should reverse and remand for entry of such an injunction, or at least for reconsideration of Lopez's motion.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complainant need only "state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Watanabe v. Derr*, 115 F.4th 1034, 1037 (9th Cir. 2024). A court must assume the truth not only of all facts his complaint alleges but also all logical inferences therefrom. *Mayfield v. City of Mesa*, 131 F.4th 1100, 1104 (9th Cir. 2025). This Court reviews *de novo* a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Regino v. Staley*, 133 F.4th 951, 959 (9th Cir. 2025). If it is a close question whether a constitutional injury occurred, reversal is appropriate because of the irreparable harm of false negatives. *Cf. Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1160 (9th Cir. 2022).

Additionally, this Court "review[s] the denial of a preliminary injunction for abuse of discretion and the underlying legal principles de novo." *Hall v. U.S. Dep't of Agriculture*, 984 F.3d 825, 835 (9th Cir. 2020).

## ARGUMENT

### I. The Ordinance Is Unconstitutionally Vague and Overbroad.

The Supreme Court has "traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). As to the Fourteenth Amendment's protection against vagueness, it is a bedrock "principle in our legal system …

19

that laws which regulate persons or entities must give fair notice of conduct that is forbidden." *Butcher v. Knudsen*, 38 F.4th 1163, 1168 (9th Cir. 2022); *see Colten v. Kentucky*, 407 U.S. 104 (1972). A law fails the vagueness inquiry if its provisions and key terms are not clearly defined. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012); *Edge v. City of Everett*, 929 F.3d 657 (9th Cir. 2019). That is, a law must be written so that (1) a person of ordinary intelligence can know what it prohibits and (2) those who enforce the prohibitions are given objective standards to apply. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Tucson v. City of Seattle*, 91 F.4th 1318, 1329 (9th Cir. 2024).

The Supreme Court has emphasized that these requirements are even more stringent when a law affects speech, *Smith v. Goguen*, 415 U.S. 566, 573 & n.10 (1974), especially if it imposes criminal penalties, *Palmer v. City of Euclid*, 402 U.S. 544, 545-46 (1971); *see Matsumoto v. Labrador*, 122 F.4th 787, 805 (9th Cir. 2024). That includes regulation of abortion-related speech. *Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383 (1997); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 451-52 (1983). Otherwise, speech that politicians disfavor

20

will lack "breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

As to overbreadth, the First Amendment protects against laws that "prohibit[] a substantial amount of protected speech relative to [their] plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762 (2023) (internal quotation marks omitted). Because "[o]verbroad laws may deter or chill constitutionally protected speech, . . . the overbreadth doctrine allows a litigant . . . to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Id.* at 770.

The ordinance here plainly violates both doctrines. Its broad prohibitions on "harassment" and "noise" (including "*offensive* noise") are both unconstitutionally vague and overbroad.

## A.    "Harassment" and ill-defined "noise" are unduly vague.

The district court held the ordinance's ban on "harassment" is sufficiently clear because it defines "harassment" "using widely accepted legal standards." 1-ER-21. But the "harassment" provision fails to specify *any* legal standards for such key terms as "seriously alarm," "aggravate," or "cause substantial distress." Additionally, the provision's scienter requirement is not a saving remedy where, as here, the operative terms

themselves are insufficiently limited. *See Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 821 (9th Cir. 2016) (observing that a specific intent requirement "does little to answer the question central to our constitutional concerns—specific intent to do what?").[1]

The district court also did not address the "harassment" provision's ban on "approaching or following a person with intent to harass once the person has *indicated* they do not want to be approached or followed." § 52.1002 (emphasis added). The ordinance nowhere defines what qualifies as such an indication—thereby freezing sidewalk counselors like Lopez who sensibly want to give legal gray zones a wide berth. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone.") (Internal quotation marks omitted.) Even a sidewalk counselor who can correctly gauge which gestures—or even changes in gait—"indicate" that

---

[1] Notably, "harassment" is defined to require only *general* intent to engage in the action that allegedly "would seriously alarm or aggravate," etc., rather than *specific* intent to *actually cause serious alarm*, aggravation, etc. §52.1002. *See United States v. Starnes*, 583 F.3d 196, 209 (3d Cir. 2009) ("As most commonly understood, a general-intent crime is one that requires proof of knowledge with respect to the *actus reus* of the crime, while a specific-intent crime, in contrast, is one whose definition requires a special *mens rea* above and beyond that which is required for the *actus reus* of the crime.") (cleaned up.)

a passerby wants to be left alone, the ordinance leaves him on tenter-hooks about what might count as "harassment." Asking a passerby, "quietly and politely, two times, whether she will take literature or ... has any questions? Three times? Four times?" *McCullen*, 573 U.S. at 500 (Scalia, J., concurring) (observing that New York City's follow-and-harass law is likely vague).

Additionally, while subdivision (b)(1) of section 52.1003 only prohibits harassment that involves "approach[ing]" another "within eight feet," subdivision (b)(2) prohibits all other harassment without requiring an "approach"—making the harassment provision in (b)(1) nonsensical or redundant.

This is especially significant given that in defining "harassment," the ordinance states that it "does *not* include . . . displaying a sign from *more* than eight feet away from a person or persons." §52.1002 (emphasis added). But that implies that holding a sign *within* eight feet of another can indeed constitute "harassment" (i.e., "willful action," "directed at a specific person," that would "seriously alarm or aggravate" an allegedly reasonable person). In other words, a counselor would not violate the "approach" provision by standing still and allowing passersby to come within

23

8 feet, but he would violate the harassment provision if he kept holding his sign and did not put it away.

The potential sweep of the ordinance's broad (and blatantly speech-restrictive) definition of "harassment" in § 52.1002, in tandem with § 52.1003(b)(2)'s bar on *stationary* harassment is breathtaking—and all but ensures that speakers like Lopez lack fair notice as to whether their quintessential First Amendment speech (including *peaceful sign holding*) remains protected, and that San Diego law enforcement lacks sufficient enforcement standards.

A similar problem infects the ordinance's prohibition on undefined "offensive noise" that causes "discomfort" or "annoyance" to an alleged reasonable person. § 52.1004(a)(1). The Supreme Court has already held that a ban on "annoying" speech is vague. *See Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971); *see also City of Everett*, 929 F.3d at 665. And the restriction here is not saved by the "reasonable person" standard because "[c]onduct that annoys some people does not annoy others," such that "no standard of conduct is specified at all." *Coates*, 402 U.S. at 614; *see also Vill. of Hoffman Ests. v. Flipside Hoffman Ests., Inc.*, 455 U.S.

24

489, 495 n.7 (1974) (provisions that "ha[ve] no core" are inherently vague).

Even if the "reasonable person" qualifier were a remedy here, the Supreme Court has long recognized that anti-noise ordinances must still "prescribe" *objective* "standards" to limit the exercise of unbridled enforcement discretion. *Saia v. People of State of New York*, 334 U.S. 558, 560 (1948) ("The statute is not narrowly drawn to regulate," inter alia, "the volume of sound (the decibels) to which they must be adjusted."). It is difficult to imagine a more standardless limitation on "noise" than "*offensive*" noise. Indeed, "if the basis for" an "objectively reasonable person's" "annoyance is disdain or *offense to*" another's speech, "a law that permits curtailing speech on the basis of that annoyance is invalid." *Harman v. City of Santa Cruz*, 261 F. Supp. 3d 1041, 1044 (N.D. Cal. 2017) (emphasis added). That is because *offensive* noise is an inherently subjective standard, as noise that offends one person might be entirely benign to another. Accordingly, the city's unprecedented restriction on "offensive" noise is manifestly void for vagueness.

### B. The harassment and noise provisions are overbroad.

For similar reasons, the ordinance's "harassment" and noise provisions are also overbroad. Their inherent lack of cognizable standards ensure they reach a substantial amount of protected speech relative to any plainly legitimate sweep. That's exactly the kind of flaw which "may deter or chill constitutionally protected speech" in violation of facial overbreadth. *United States v. Hansen*, 599 U.S. 762, 770 (2023) (internal quotation marks omitted).

In short, these provisions are full of sound and fury signifying nothing. *Cf.* William Shakespeare, Macbeth act 5, sc. 5, l. 31. They lack fair notice, and yield unbridled discretion to law enforcement, who are given no objective standards to differentiate permissible and impermissible speech. *See Grayned*, 408 U.S. at 108-09. Such a standardless sweep conjures a specter of "policemen, prosecutors, and juries [unleashed] to pursue their personal predilections." *Marinello v. United States*, 584 U.S. 1, 11 (2018); *see* Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 320 (2000). The unascertainable standard impermissibly chills speech and facially violates the Fourteenth and First Amendments.

26

## II. The Ordinance is Not Narrowly Tailored as Required of Even Content-Neutral Restrictions.

Because public streets and sidewalks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," any burden on speech in such "traditional public fora" must survive at least intermediate scrutiny. *McCullen*, 573 U.S. at 476-77 (internal quotation marks omitted).

For a law to be narrowly tailored, "it must not burden substantially more speech than is necessary to further the government's legitimate interests"—i.e., it "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 486 (internal quotations marks here).

The ordinance contains multiple narrow tailoring flaws: (A) its application to *any* health care facility, place of worship, or school grounds across San Diego burdens vastly more speech than necessary to accomplish any legitimate interest; (B) the *overlapping* nature of the challenged restrictions likewise burdens substantially more speech than necessary, and (C) the ordinance's floating bubble zone requirement at § 52.1003(c) is not in any way tailored, as it must be, to the actual facts

27

and circumstances outside San Diego abortion facilities at the time of passage (or in the years leading up to it). Each is considered in turn.

### A. The ordinance's application to any health care facility, school grounds, or place or worship burdens substantially more speech than necessary.

The Supreme Court has made clear that narrow tailoring hinges on the record. Thus, in *McCullen*, the Court held that "[f]or a problem shown to arise only once a week in one clinic, creating 35-foot buffer zones at *every* clinic across the Commonwealth is hardly a narrowly tailored solution." 573 U.S. at 493 (emphasis added). The ordinance contains the same defect—as nothing in the Verified Complaint (in which the well-pled facts must be taken as true at this stage), or in any other document, shows that its expansive application across San Diego is in any way tailored to the alleged problems that led to its enactment.

Indeed, just last week (on June 2, 2025), in a parallel challenge to the same ordinance with respect to its application outside of *school grounds*, the U.S. District Court for the Southern District of California noted that "it appears that the city's justification for enacting the ordinance is based on little more than 'mere conjecture,' 'hypotheticals,' and 'vague allusions to practical experience' regarding the need to restrict

28

leafletting and one-on-one conversations near schools." *Don Blythe v. City of San Diego*, No. 3:24-cv-2211, 2025 WL 1570528, at *11 (S.D. Cal. 2025) (quoting *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647, 653-54 (9th Cir. 2007)). The district court thus held that "[a]t the motion to dismiss stage, this is sufficient to find that, based on the current record, the ordinance is not narrowly tailored to serve the city's interests in protecting students leaving schools from harassment, obstruction, and intimidation." *Id.* at *12.

The same result obtains with respect to the ordinance's application to health facilities, and for the same reasons. *See also* Sec. II.A.2., *infra*. Indeed, the Sixth Circuit recently invalidated a *fixed* buffer zone outside all "healthcare facilit[ies]" in Louisville, Kentucky on this basis: "[T]he County sought to advance its interests by imposing a buffer zone on *all* medical facilities in Louisville. And why? The record does not reveal access problems beyond EMW . . . yet the ordinance covers every single hospital, clinic, and dentist's office in the area." *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 405 (6th Cir. 2022). As a result, the Sixth Circuit held "the ordinance lacks any tailoring, to say nothing of narrow tailoring." *Id.*

29

The same is true here. The ordinance applies to every form of health care facility, school, and house of worship across San Diego, even though a federal court has now determined the premise for this expansive sweep was "mere conjecture." *Blythe*, 2025 WL 1570528, at *11. That holding alone means the ordinance is not narrowly tailored on its face. *See Sisters for Life*, 56 F.4th at 407 ("[I]f a statute is not narrowly tailored, it cannot be constitutionally applied to *anyone*, even if a more narrowly tailored statute might still capture a plaintiff's conduct.") (Emphasis in original.) But the Verified Complaint and record evidence show no evidence of *any* cognizable, let alone widespread, obstruction or harassment outside abortion facilities in San Diego, 3-ER-343-368, and certainly not enough to justify sweeping restrictions on *all* healthcare facilities city-wide.

It's true that the Supreme Court in *Hill* deemed a bubble zone narrowly tailored even when it applied to any "health care facility." 530 U.S. at 731. But that statute did not purport to *further* apply to all *school grounds* or *places of worship*, and thus did not contain nearly the same breadth as the ordinance here. And no lower court that has since upheld an otherwise similar buffer zone as *Hill* has expanded *Hill* to allow buffer zones around health care facilities, school grounds, and places of worship.

30

The inclusion of such areas makes this case categorically different from *Hill*.

Accordingly, the ordinance's application to all health care facilities, school grounds, and places of worship "regulate[s] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *McCullen*, 573 U.S. at 486. The district court's dismissal should be reversed for this reason alone.

### B. The ordinance's overlapping restrictions also burden substantially more speech than necessary.

The ordinance's challenged provisions notably *overlap* in such a way as to restrict more speech than a normal *Hill*-style "bubble zone," further distinguishing *Hill* and violating intermediate scrutiny under *McCullen*.

Indeed, in *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009) the Third Circuit held that a Pittsburgh ordinance combining a 15-foot fixed buffer zone and *Hill*-style 8-foot floating zones around abortion clinic entrances failed narrow tailoring. The Third Circuit clarified that whenever a government layers extra speech restrictions on top of those implicated in *Hill*, a reviewing court must consider how all those restrictions work in tandem. *See id.* at 270-82. After finding the combined

31

effect of the two provisions burdened substantially more speech than necessary "to achieve the city's legitimate interests in preventing harassment and obstruction of entrances," *id.* at 279-280, it held that "either one of the two zones, standing alone, would advance" those interests, *id.* at 280, and remanded the case to the district court.

At minimum, the same result should obtain here. The district court relied entirely on *Hill* in finding the ordinance content-neutral and sufficiently tailored. But *Hill* merely held that an 8-foot bubble zone, alone, satisfied intermediate scrutiny. Here, the city has layered on top of an 8-foot bubble zone additional broad *harassment* and *anti-noise* provisions. The distinct operation of these provisions show the severity of their combined effect.

The ordinance's *Hill*-style bubble zone requires a predicate "approach," which ostensibly allows a sidewalk counselor "to stand still while a person moving toward or away from a health care facility walks past her," even if their proximity is closer than eight feet. *Hill*, 530 U.S. at 713. But as mentioned, the ordinance additionally forbids harassment that does *not* involve a predicate "approach," *compare* § 52.1003(b)(1) (requiring approach); *with* § 52.1003(b)(2) (no approach required), while

32

implying that holding a sign while *closer* than 8 feet from a passerby can very well constitute harassment. *See* Sec. I.A, *supra*. Thus, unlike in *Hill*, the ordinance does not ensure a sidewalk counselor—while holding a sign or otherwise communicating in a way that can be deemed stationary harassment—may stand stationary as a woman walks by within eight feet.

The anti-noise ordinance only piles on. Even if the sidewalk counselor remains stationary in compliance with the bubble zone, and even if the counselor does not engage in stationary "harassment," the counselor still must avoid making undefined "offensive noise" (which presumably can include talking about controversial subjects) which causes "discomfort" or "annoyance" to a reasonable person. The burden of such a restriction goes far beyond the *physical-approach* dependent *Hill*-style bubble zone.

Accordingly, the combined effect of the ordinance's challenged provisions "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (internal quotation marks omitted). At minimum, the district court's dismissal should be reversed and the case remanded for the district court to enjoin at least some of the challenged restrictions.

33

## C.  The record here is distinct from that in *Hill*.

As noted, the narrow tailoring inquiry is necessarily based on the facts giving rise to the challenged restriction. But there are at least four dissimilarities here that *Hill* itself deemed analytically important.

**Difference #1: Why the zones were drawn.**

Consider first why the two governments enacted their respective bubble zone laws. Colorado identified a significant, serious public safety problem: a history of specific, violent clashes between pro-life and pro-choice demonstrators had regularly rocked Boulder and Denver for eight years before Colorado enacted its law. *See* C. Brennan, *Anti-Abortion Leader Targets Boulder Clinic*, Rocky Mtn. News (Oct. 22, 1985); Joint App'x at 93a, *Hill v. Colorado*, 530 U.S. 703 (2000) (No. 98-1856), 1999 WL 33612749 ("*Hill* Joint App'x"). Demonstrators were regularly squaring off, with tensions flaring and physical violence ensuing. *See* C. Brennan, *Abortion Foe Skips Confrontation*, Rocky Mtn. News (Jan. 3, 1986). When violence erupted, police struggled to maintain order. *See* Hill Joint App'x at 93a.  Public discussion itself was thus viewed not to be the primary target of the buffer zone. For a modern analogue, think of Mayor Bass's curfew in response to the protests that recently swept Los Angeles.

34

*See Kaitlyn Schallhorn, Here's What You Need to Know About LA's Down-town Curfew,* L.A. Daily News (June 11, 2025).

Colorado's claimed public safety motive for its bubble zone statute was supported by the extensive legislative history of both its own statute and the Boulder ordinance on which it was based. Both the Boulder City Council and the Colorado Legislature had held numerous hearings on violence at abortion protests before the state statute was enacted. At those hearings, clinic staff and escorts laden with police logs and incident reports laid out detailed claims of clinic invasions and cordons of protesters muscling pamphlets into the hands of passersby that found at least some support in independent press coverage. *See* Hill Joint App'x at 59-60, 113-17; Note, *Too Close for Comfort: Protesting Outside Medical Facilities*, 101 Harv. L. Rev. 1856 (1988).

San Diego postured in its motion to dismiss that its own ordinance also was essential to secure public safety and order. *See* 2-ER-166; San Diego Mun. Code § 52.1001. But unlike in Colorado in 1993, that claim is self-evidently absurd in San Diego in 2025. Whereas hordes poured onto Colorado streets and state legislators pored over documented horror stories, San Diego does not even pretend to have any evidence that pro-lifers

35

pose a nonspeculative harm to anyone in the city. More than a year after former City Attorney Elliott began drafting the ordinance with abortion activists, and months into this litigation, San Diego hasn't presented a single verified incident supporting any one of the myriad speech restrictions in the ordinance.

The city attorney's inability to find such concrete evidence is not a knock on her team's research skills. There simply is no public evidence that local abortion protests endanger public safety or order: no testimony from any of the nearly 112,000 patients the clinic's operator serviced last year, *see* Planned Parenthood Pac. Sw., *FY2024 Impact Report: Patient Services* (2025), and no news article, photo, or police report. Even the unsubstantiated anecdotes from Planned Parenthood employees offered at the city council meeting where the speech ban was approved—in the unlikely event they are true—collectively establish that a pro-lifer says one mean thing to one clinic employee or volunteer in San Diego about once every 20 months. *See* 3-ER-354-355.

That absence of evidence supporting the stated rationale for the speech ban only strengthens the inference that its true purpose was one apparent throughout its drafting and enactment: a desire to silence pro-

36

life views. The ordinance was promised at a press conference denouncing *Dobbs*; drafted by abortion-rights activists; approved by councilmembers fresh from an abortion gala where they pilloried pro-lifers; and immediately rewarded with a campaign contribution to current City Attorney Ferbert. The public record, in short, reeks of an overriding aim "to eliminate disfavored ideas"—namely, pro-life messages once lawfully shared with passersby outside San Diego's abortion clinics under aegis of the First Amendment. *See 303 Creative LLC*, 600 U.S. at 602.

**Difference #2: How quickly the zones were drawn.**

Consider next how quickly the two governments turned to drawing bubble zones they knew would suppress abortion speech, which enjoys "special … First Amendment protection." *Hoye*, 653 F.3d at 839.

It is well-established that before restricting speech, a government must make a serious effort to achieve its policy goals through alternative means. "If the First Amendment means anything," the Supreme Court has emphasized, "it means that regulating speech must be the last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). Solving public policy problems by stifling speech is "not something that

37

this country lightly allows." *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 404 (6th Cir. 2022).

The Supreme Court set guidelines for how quickly a government may resort to speech-restricted zones outside abortion clinics in two cases decided shortly before *Hill*. In them, courts imposed fixed buffer zones of different sizes around abortion clinic entrances to prevent obstructions and blockades. The Court upheld the zones only because the governments had first tried but failed to quell aggressive protests through less-restrictive means before seeking judicial intervention. *See Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997); *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753 (1994).

In the years leading up to its enactment of the bubble zone law challenged in *Hill*, Colorado took a similarly gradual and escalating approach to addressing abortion-related violence. For years, it had spun its wheels on tactics culminating in failed mediation between pro-life and pro-choice advocates. *See Hill* Joint App'x at 95a-96a, 106-07, 147, 210. The *Hill* Court acknowledged as much, noting the breadth of Colorado's non-speech-restrictive measures and recognizing the bubble zones as a last

38

line of defense. *See* Transcript of Oral Argument at 30, *Hill v. Colorado*, 530 U.S. 703 (2000) (No. 98-1856) ("*Hill* Oral Argument Transcript").

Colorado gradually escalated interventions over years in response to significant demonstrated violence and disorder. San Diego did not even try to enforce its prior abortion clinic buffer zone law, in effect from 1997 to 2024, or other public safety laws, to remedy whatever harms allegedly required the radical speech restrictions in its new ordinance. And whatever the inadequacies of San Diego's prior laws, none of them appeared in verified patient complaints or in media or police reports. Had the city seriously believed danger was imminent, it could have increased police patrols, installed surveillance cameras, hardened facility security, run tabletop preparedness exercises, or implemented mitigation strategies— on top of seeking to enforcing all of its then-existing laws.

Instead, the city attorney held a press conference, and she and the city council idled while abortion activists reformatted their wish lists into an ordinance. Assuming her office fully responded to Lopez's FOIA request for documents, no city employee during that time even examined whether the new ordinance would marginally increase safety and order.

**Difference #3: Bubble zone design principles.**

Third consider the design and design considerations of the bubble zones in Colorado and San Diego. The district court held the bubble zones are analytically identical in every material respect because they share some traits. Both laws' zones exist within 100 feet of a covered facility's main entrance or entry gate, are eight feet in radius, and prohibit individuals from knowingly and willingly entering the zones without the consent of the person approached to protest, counsel, or educate. *See* 2-ER-163 at 8; Colo. Rev. Stat. § 18-9-122; San Diego Mun. Code § 52.1003(c)(1).

Testing a theory even Colorado and its *Hill* amici rejected, San Diego says those similarities are dispositive. *See* Brief in Opposition to Petition for Writ of Certiorari at 22, 25-27, Hill v. Colorado, 530 U.S. 703 (2000) (No. 98-1856) ("*Hill* BIO"); Brief for NARAL, et al. as Amici Curiae Supporting Respondents at 15-18, *id.*, 1999 WL 1186249. That is because, San Diego says, *Hill* painted a brightline rule rather than draw up principles. The rule? If a bubble zone has a radius of eight feet and requires consent and scienter, it always is content-neutral and advances a

government interest in a narrowly tailored way. Nothing else matters—not even the facts are on the ground. 2-ER-163-164.

The majority in *Hill* expressly rejected that categorical approach during oral argument. Explaining how Colorado's bubble zones could be constitutional even though they restricted speech more than two bubble zones the Court recently had struck down—*see Madsen*, 512 U.S. at 774; *Schenk*, 519 U.S. at 377—the Justices said local conditions matter. *See Hill* Oral Argument Transcript at 10-14, 47. Assuming a bubble zone is content-neutral, it can be as wide as needed for safety so long as it remains small enough for speakers outside the bubbles to still carry on a normal conversation amid local noise levels. *See id*.

This Court already recognized that *Hill* sketches out principles rather than lines in upholding parts of Oakland's bubble zone law in 2011. *See Hoye*, 653 F.3d 835 (9th Cir. 2011). "Government must consider the **actual conditions** speakers encounter when it restricts their speech," this Court insisted. *Id.* at 843 (emphasis added). Therefore, "it may be unconstitutional to apply" a given bubble zone or parts thereof "if, under the circumstances surrounding a particular reproductive health clinic at a particular time, the application of [that zone] would effectively foreclose

41

speakers' ability to communicate their message." *Id.* Lest it be misunderstood, this Court concluded that whether a speech regulation "unconstitutionally restricts[] … speech is ultimately a causation question based on the particular facts." *Id.* at 858-59.

Here, the district court erred in stating Lopez allegedly provided "no legal support for his argument that the bubble zone principles articulated in *Hill* do not apply." 1-ER-14. Lopez's actual argument was and remains that, insofar as *Hill* has continuing effect, its design principles must be followed—and San Diego failed to follow them. 2-ER-103-105.

Further, in *Hill* the Supreme Court was satisfied that the bubble zone there "allow[ed] the speaker to communicate at a 'normal conversational distance'," as required by the Supreme Court's prior holding in *Schenck. See Hill*, 530 U.S. at 726-27 (quoting *Schenck*, 519 U.S. at 377). But as detailed in Lopez's complaint, here ambient road noise near the downtown clinic typically is three to four times as loud as a normal conversation. 3-ER-356. For much of the day, one simply cannot be heard from more than eight feet away without shouting. 3-ER-353. And even those shouts cannot always break through the added din when abortion

42

clinic "agents or volunteers," exempt from the buffer zone restrictions, try to drown out the pro-lifers who are not exempt.

**Difference #4: No alternative communication channels.**

Consider fourthly how much more comprehensively the ordinance shuts down alternative communication channels compared to the Colorado statute upheld in *Hill*. That statute prohibited only two narrowly defined categories of conduct: (1) obstructing access to a healthcare facility and (2) knowingly approaching within eight feet of a person, without consent, to leaflet, display a sign, or engage in oral protest, education, or counseling. *See* Colo. Rev. Stat. § 18-9-122(3).

The city claims that Ordinance O-21822 mirrors the Colorado statute in all relevant respects. It does not in at least three ways. First, the Colorado statute measured its 100-foot zone from a facility entrance; San Diego, by contrast, measures its buffer from an outer entry gate, which at many covered facilities sweeps in much more public sidewalk. Second, Colorado's statute applied only to licensed healthcare facilities; San Diego's, by contrast, covers anyplace a licensed healthcare worker regularly sees patients or dispenses medical advice or information. Third, Colorado's statute prohibited obstructing healthcare facilities; San Diego's

43

prohibition, by contrast, also prohibits obstructing any parking lot in the city that a facility owns, uses, or even tells a patient she can use.

Each departure from the Colorado statute upheld in *Hill* captures extra public sidewalk, censoring affected speakers farther from clinics, passersby, and motorists—further narrowing their remaining avenues for person-to-person communication. Compounding the problem are the ordinance's harassment provision and uniquely oppressive noise ordinance, both of which are designed to winnow communication options yet further and have no counterpart in e Colorado statute. *See* San Diego Mun. Code § 52.1002.

Accordingly, the ordinance is not narrowly tailored for this separate series of reasons, as well.

## III. The Ordinance is Content-Based Even Under *Hill*.

If *Hill* remains good law, the ordinance is still content-based for at least three reasons: (1) the exception in § 52.1003 for employees, agents, or volunteers acting within the scope of their employment, agency, or volunteer service is a *speaker*-based distinction and is thus distinguishable from an otherwise similarly worded exception upheld in *McCullen*; (2) unlike in *Hill*, the motivation for San Diego's ordinance was viewpoint-

44

based; and (3) the ordinance's ban on "offensive," "discomfort[ing]," and "annoy[ing]" noise plainly turns on listener reaction and is thus inherently content-based under *McCullen*. Further, because these provisions cannot survive even intermediate scrutiny, they a fortiori fail strict scrutiny.

### A. The exception for employees, agents, and volunteers is speaker-based discrimination, unlike in *McCullen*.

The Supreme Court's "precedents are deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Family & Life Advocs. ("NIFLA") v. Becerra*, 585 U.S. 755, 777-78 (2018) (cleaned up). The Supreme Court has already recognized that if a law's "exemption for clinic employees would [ ] facilitate speech on only one side of the abortion debate," it would be "a clear form of viewpoint discrimination" *McCullen*, 573 U.S. at 485.

Here, the ordinance's exemption for employees, agents, and volunteers does just that. It exempts these individuals from a restriction on approaching a woman to "protest, educat[e], or counsel[]," or to "display a sign" or "pass a leaflet to" another. § 52.1003(f)(2). The ordinance thus facially discriminates based on *speaker*: abortion clinic workers are

45

allowed to engage in such speech, whereas pro-life sidewalk counselors like Lopez are not.

This is distinct from the otherwise similarly worded exemption for clinic workers in *McCullen*. There, whether someone violated the fixed buffer zone at issue "depend[ed] not on what they sa[id], but simply on where they sa[id] it." 573 U.S. at 479 (cleaned up). Accordingly, that exemption was not, without more, an exercise of speaker-based discrimination. *See id.* at 483 ("There is nothing inherently suspect about providing some kind of exemption to allow individuals who work at the clinics to *enter or remain within the buffer zones*.") (Emphasis added.)

Not so here. The ordinance's exemption directly facilitates what someone may *say*—i.e., "educating," "counseling," leafletting, etc., not *where they stand*. *See* § 52.1003(f)(2). The same individuals are even exempted from the ordinance's restrictions on *harassment*. *See* §§ 52.1003(b) & 52.1003(f)(2). It should go without saying that allowing abortion clinic workers an exemption not merely to *stand* in a particular area, but to *engage in particular speech or harassment* raises the specter

46

of viewpoint discrimination.[2] *See NIFLA*, 585 U.S. at 777-78; *McCullen*, 573 U.S. at 485. The 8-foot zone in *Hill* contained no such exception. *See* 530 U.S. at 707 n.1. Accordingly, here the ordinance's restrictions on harassment and sidewalk "counsel[ing]" must undergo strict scrutiny.

### B. The city's underlying viewpoint animus renders the bubble zone content-based.

In *Hill*, the Supreme Court assumed that "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a zone regulation of speech because of disagreement with the message it conveys." 530 U.S. at 719 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The Court was satisfied the bubble there "was not adopted 'because of disagreement with the message it conveys,'" in part based on "the Colorado courts' interpretation of [its] legislative history." *Id.* Indeed, its enactment was based on the *particular conduct*, not the viewpoint, of certain violent protestors in Colorado. *Id.* at 724-25.

---

[2] And the city was careful in crafting the exemptions benefiting employees, agents, and volunteers: providing them exemptions from the ordinance's "educating," "counseling," and leafletting provisions and from its harassment provisions, while expressly *not* exempting them from the ordinance's noise provisions (which solely exempt public safety officers).

Here, on the contrary, evidence abounds of the city's *viewpoint*-based purpose in adopting the ordinance—particularly at the motion-to-dismiss stage where all reasonable inferences must be drawn in Lopez's favor. *Mayfield*, 131 F.4th at 1100. As pled and documented throughout Lopez's Complaint, the ordinance was announced at a press conference celebrating abortion and denouncing *Dobbs*, conceived by a charter member of California's Reproductive Rights Taskforce (itself founded in response to *Dobbs*), drafted with abortion activists, and zealously pushed by councilmembers fresh from an abortion gala where they pilloried pro-lifers, and was immediately rewarded with a campaign contribution to the current city attorney. *See, e.g.*, 3-ER-344-345; 3-ER-354-356; 3-ER-357. And the ordinance gallingly allows abortion clinic personnel to "harass" the public (including sidewalk counselors like Lopez), to leaflet, to freely protest, educate, and counsel, including speaking without regard to noise limitations applicable to Lopez and other members of the public.

That is the kind of evidence this Court has previously recognized reeks of viewpoint discrimination in the context of a government restriction on protected speech. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1191-92 (9th Cir. 2018) ("The legislative history reveals a

48

complex series of motivations behind the statute," including to "shield the agricultural industry from" disfavored speech); *see also id.* at 1196 ("If . . . , as a number of legislators made clear and the dairy lobby underscored, the statute was intended to quash investigative reporting on agricultural production facilities," then the statute "cannot be squared with a content-neutral trespass law"), *abrogation on other grounds recognized by Project Veritas v. Schmidt*, 125 F.4th 929, 945-46 (9th Cir. 2025) (en banc); *see also Ward*, 491 U.S. at 791. Indeed, such direct evidence "amounts to a confession of error," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8 (2024), that the ordinance silences "only some messages and some persons" to "eliminate disfavored ideas." *303 Creative LLC*, 600 U.S. at 602.

Under *Hill*'s own rules, therefore, Lopez's well-pleaded facts give rise to a reasonable inference that the ordinance was adopted "because of disagreement with" the viewpoint expressed by pro-life sidewalk counselors in San Diego—rather than any obstructive or non-viewpoint-related conduct—rendering it content-based and subject to strict scrutiny (which it easily fails).

49

## C. Restricting "offensive," "discomfort[ing]," and "annoy[ing]" noise is per se content-based.

In *McCullen*, the Supreme Court clarified that a speech restriction "would not be content neutral if it were concerned with the undesirable effects that arise from the direct impact of speech on its audience, or listeners' reactions to speech"—"for example," if "the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, **such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech**." 573 U.S. at 481 (emphasis added) (cleaned up); *see also id.* at 477 (stating government generally lacks power to "selectively shield the public from some kinds of speech on the grounds that they are more offensive than others") (cleaned up).

The ordinance's noise provision explicitly hinges on pure listener reaction and thus lacks any pretense of facial content-neutrality. Specifically, it forbids "offensive" noise if it "causes discomfort or annoyance" to a reasonable person. § 52.1004(a)(1). But "offensive[ness]" ipso facto is a listener reaction as the Supreme Court recognized in *McCullen*. And banning such noise based on causing "discomfort" or "annoyance"—even to a reasonable person—likewise hinges on another's reaction.

50

In *McCullen* the Supreme Court deemed a fixed buffer zone content-neutral in essential part because it applied "irrespective of any listeners' reactions." 573 U.S. at 481. The same cannot be said of the noise provisions here, which hinge explicitly on engaging in undefined "noise" that is "offensive" and causes "discomfort" or "annoyance" in another. *See Harman*, 261 F. Supp. 3d at 1044 (holding noise ordinance "impermissibly sweeps within its prohibitions speech that one finds annoying based on its *content* rather than is sound") (emphasis in original) (internal quotation marks omitted).

Accordingly, the ordinance's noise provision likewise lacks content neutrality and must undergo strict scrutiny. And it bears noting the Supreme Court has repeatedly held "that the government may not prohibit [speech] simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The "offensive" noise provision thus per se violates the First Amendment.

## IV. The District Court Erred in Applying *Hill*.

The district rejected Lopez's express argument that *Hill* is no longer good law, the demise of which renders the ordinance unconstitutional

51

based on normal constitutional principles. 1-ER-12-13. This Court can and should hold as much.

*Hill* by now is the "emperor with no clothes" of First Amendment jurisprudence. Numerous courts and judges have observed that it cannot be squared with subsequent First Amendment precedents. *See infra*. And the Supreme Court itself recognized as much in *Dobbs*. *See* 597 U.S. at 287 & n.65 (reversing *Roe v. Wade*, 410 U.S. 113 (1973), in part given its influence on the "distort[ed]" First Amendment holding in *Hill*, and relying on Justices Scalia's and Kennedy's *Hill* dissents).

This Court should hold that *Hill* is no longer valid. While the district court pointed to the familiar rule in *Agostini v. Felton*, 521 U.S. 203, 237 (1997), that it is the Supreme Court's "prerogative of overruling its own decisions," *see* 1-ER-13, Justice Thomas recently explained that the Supreme Court *has* effectively overruled *Hill*—and thus lower courts should no longer feel "compelled to uphold *Hill*-like buffer zones around abortion clinics." *See Coalition Life v. City of Carbondale*, 145 S. Ct. 537, 540 (2025) (Thomas, J., dissenting from denial of certiorari) (noting the Supreme Court recently explained that "lower courts should have recognized" the demise of the so-called "*Lemon* test" in the Establishment

52

Clause context after it had been long abandoned by the Supreme Court, and "*Hill*'s abandonment is arguably even clearer than *Lemon*'s").

Accordingly, this Court should recognize *Hill*'s demise and apply normal First Amendment principles to the ordinance's bubble zone— which thus facially restricts speech based on content and easily fails strict scrutiny.

### A. The Supreme Court has abandoned *Hill*.

As the Supreme Court has repeatedly emphasized in recent years, it can overrule its own decisions expressly or implicitly. The latter is more common than often realized. Several procedural rules keep challenges to most of the Supreme Court's 230 years of precedents off its docket for years or even decades at a stretch. *United States v. Vaello Madero*, 596 U.S. 159, 180 (2022) (Gorsuch, J., concurring); Amy Coney Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921, 1929 (2019). While they collect dust, other decisions sometimes weaken their logic so much that they effectively have been "hollow[ed] out as if by termites." *Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1223 (9th Cir. 2013) (Kozinski, J., dissenting).

The dissenting Justices in *Dobbs* listed nearly *thirty* such "zombie" precedents they argued the Supreme Court had implicitly overruled in recent decades. *See Dobbs*, 597 U.S. at 417-22 (Breyer, Sotomayor, and Kagan, JJ., dissenting).

Modern America would be unrecognizable if precedents could *not* zombify. The Supreme Court has never expressly overruled precedent allowing military conscription of children, *United States v. Williams*, 302 U.S. 46 (1937), or sterilizing the mentally unfit, *Buck v. Bell*, 274 U.S. 200, 207 (1927), or imprisoning those who have extramarital sex, *Hoke v. United States*, 227 U.S. 308, 322-23 (1913), or race-based curfews, *Hirabayashi v. United States*, 320 U.S. 81 (1943), or banning voting by non-married adults, *Murphy v. Ramsey*, 114 U.S. 15, 43 (1885), or requiring a husband's written consent for an employer to pay his wife wages. *Mut. Loan Co. v. Martell*, 222 U.S. 225, 231-34 (1911). Even *Plessy v. Ferguson*, 163 U.S. 537 (1896), was not expressly overruled in *Brown v. Board of Education*, 347 U.S. 483 (1954), just distinguished as inapplicable to schools. Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 767 (1999); *see generally* Richard M. Re, Essay, *Narrowing Precedent in the Supreme Court*, 114 Colum. L. Rev. 1861 (2014).

54

The Supreme Court laid the required framework for identifying such zombie precedents across three cases in the early 2020s. Put simply, three criteria must be met. First, later Supreme Court cases must have entirely undercut the examined case's reasoning. Second, the Supreme Court must have confessed that the examined case was an "anomaly" in its caselaw. Third, the Supreme Court must have stopped applying the examined case. *See Ramos v. Louisiana*, 590 U.S. 83 (2020); *Janus v. AF-SCME*, 585 U.S. 878 (2018); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022); *see also Trump v. Hawaii*, 585 U.S. 667 (2018) (expressing horror anyone could have considered *Korematsu v. United States*, 323 U.S. 214 (1944), good law in the decades before it was expressly overruled but these criteria had been met).

*Hill* meets all three criteria and so almost certainly is a zombie.

Begin with the first criterion. *Hill* concluded Colorado's buffer zone was content-neutral because it assumed: (1) a legislative intent to be content neutral can save legal text that is facially content-based; (2) the government has a content-neutral interest in protecting listeners from unwelcome speech; and (3) that narrow tailoring does not require a government to pick the less restrictive speech regulation to advance its

55

interests if a more restrictive regulation would be more efficient. *See* 530 U.S. at 718-19 & n.25. The Supreme Court has since abandoned all three assumptions. *See Reed*, 576 U.S. 155, 163-64 (2015); *McCullen*, 573 U.S. 464, 481, 495 (2014). As then-Judge Barrett held, as a member of the Seventh Circuit panel that decided *Price v City of Chicago*, in the quarter century since it decided *Hill*, the Supreme Court's "intervening decisions have eroded *Hill*'s foundation." 915 F.3d 1107, 1111 (7th Cir. 2019).

Continuing to the second and third criteria: After having never approvingly cited *Hill*'s holding even once in the decades that followed it,[3] the Supreme Court pulled no punches when denouncing it in *Dobbs* in 2022. There, the Court said *Hill* had "distorted First Amendment doctrines" by engineering a result based on the influence of *Roe v. Wade*. *Id.* at 287 & n.65. The Supreme Court approvingly cited Justice Scalia's *Hill* dissent at pages 741-42, where he deemed the majority's decision part of a post-*Roe* trend that "push[ed] aside whatever doctrines of

---

[3] The district court noted that the Supreme Court has *mentioned Hill* several times, 1-ER-13, but the Supreme Court has never *approvingly* cited the case or adopted its reasoning elsewhere. *See, e.g., City of Austin, Texas v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 76 (2022) (stating it was not "resuscitat[ing]" *Hill*).

56

constitutional law stand in the way of" abortion, and stated that "today's decision is in stark contradiction to the constitutional principles we apply in all other contexts." *Hill*, 530 U.S. at 741-42 (Scalia, J., dissenting), as cited by *Dobbs*, 597 U.S. at 287 n.65.

In short, the Supreme Court "razed" *Hill*'s "foundation" in *Dobbs*. *See Coalition Life*, 145 S. Ct. at 540 (Thomas, J., dissenting from denial of certiorari). While the Supreme Court has not "uttered the phrase 'we overrule *Hill*,'" in an analogous context (as noted) the Supreme Court recognized that "lower courts should have recognized [*Lemon*'s] demise" even though it had not been explicitly overruled. *See id.* (citing *Kennedy*, 597 U.S. at 534).

This Court should recognize *Hill*'s abandonment here. In light of *Dobbs*, it is now beyond doubt that the Supreme Court has abandoned *Hill*. Accordingly, normal First Amendment principles must now apply— even to "*Hill*-like" bubble zones.

### B. The bubble zone is facially content-based.

Ordinance O-21822 manifestly discriminates based on content on its face. It expressly forbids entering a bubble zone without prior consent for the purpose of "engag[ing] in oral protest, education, or counseling."

§ 52.1003(c)(1)(iii). Enforcing that provision inescapably turns on the content (including the "function or purpose") of what a person will say. *Reed*, 576 U.S. at 163. Those terms also "require enforcement authorities to examine the content of the message … to determine whether a violation has occurred"—another content-based hallmark. *McCullen*, 573 U.S. at 479 (internal quotation marks omitted).

As a content-based restriction on speech, the bubble zone must undergo strict scrutiny. This "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (internal quotation marks omitted). The bubble zone easily fails this test.

## C. The ordinance doesn't advance any government interest.

San Diego remarkably developed no argument below and offered no evidence that the ordinance in any way actually advances public safety. The city did note that the ordinance's purpose is to "'strike a balance between protecting the rights of those who seek access to healthcare … while also protecting the rights of those who wish to express themselves.'" 2-ER-166 (quoting San Diego Mun. Code § 52.1001). No one can doubt that the city has a significant interest in sidewalk safety. *See McCullen*,

58

573 U.S. at 486-87; *Camenzind v. Cal. Expo. & State Fair*, 84 F.4th 1102, 1114 (9th Cir. 2023). And that interest is in no way diminished just because some city councilmembers who supported the challenged ordinance themselves have ignored that interest, joining pickets and protests that have blocked traffic and entrances and impeded pedestrians. *See* 1-ER-348.

But the uncontested evidence presented in Lopez's verified complaint demonstrates that (for *decades*) there has been no problem with public safety outside city abortion clinics caused by pro-lifers and that there is no empirically justified reason to assume such a problem is likely to arise in the future. To briefly rehash that discussion here, no clinic blockade has been reported in San Diego this century, and only 1 in 2,800 pro-life protests nationwide sees even one person harassed. *See* Nat'l Abortion Fed., *2022 Violence and Disruption Statistics* 10-11 (2023). And even if one were to accept the truth of the highly dubious and unevidenced anecdotes offered at the May 21 city council meeting, there is no evidence that a bubble zone remedies those concerns.

Indeed, the only real danger is caused by the discriminatory speech ban. The First Amendment protects each patient's right to hear pro-life

views. *See Murthy v. Missouri*, 603 U.S. 43, 75 (2024). Yet the ordinance craftily keeps patients in the dark. Few people consent to speak with a stranger from more than seven feet away, and Americans less so than any other studied nationality due to differences in how Americans psychologically structure interpersonal space. *See* O. Michael Watson, *Proxemic Behavior: A Cross-Cultural Study* 73-96 & 88 tbl.21 (1970); John R. Aiello, *Human Spatial Behavior*, in Handbook of Environmental Psychology 359, 389 (Daniel Stokols & Irwin Altman eds., 1987); Robert E. Rakel, *Establishing Rapport*, in Textbook of Family Medicine 146-59 (8th ed. 2012). Indeed, Justice Scalia's *Hill* dissent (approved by the Supreme Court in *Dobbs*) already recognized that an eight-foot bubble does not preserve "normal conversational distance" on a public sidewalk. *Hill*, 530 U.S. at 756 (Scalia, J., dissenting). Yet the ordinance forces even a patient who is scared by her pregnancy to expressly consent to a conversation with a stranger who is striving to avoid invisible bubble zones and raising his or her voice to overcome the required buffer and ambient city noise.[4]

---

[4] The city attorney mused at the May 21, 2024, council meeting that the mere sight of a pro-lifer creates a danger that women might get scared.

In all events, the city's failure to present any evidence of actual disturbances currently occurring or objectively likely to occur outside any of the facilities the ordinance covers by itself would compel a court to deny its motion to dismiss. *See Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850 (9th Cir. 2004); *cf. Survivors Network of those Abused by Priests, Inc. v. Joyce*, 779 F.3d 785, 787-88 (8th Cir. 2015).

The district court's opinion noted the city "has a substantial and legitimate interest in protecting individuals attempting to access Covered Facilities." 1-ER-16. But notably absent is analysis of whether the regulations *advance* this interest, as they must if they are to survive constitutional scrutiny. The omission of analysis by itself is reversible error. *See Baird v. Bonta*, 81 F.4th 1036, 1039 (9th Cir. 2023). Reversal is

---

That is factually wrong: women report being happier after they see, hear, or talk with a pro-life sidewalk counselor. *See* Diana Greene Foster, et al., *Effect of Abortion Protestors on Women's Emotional Response to Abortion*, 87 Contraception 81, 86 tbl.4 (2013). But even imagining the city attorney were right, governments do not have a legitimate interest in preventing people from feeling scared in the absence of a reasonable risk of actual physical harm. *See Snyder v. Phelps*, 562 U.S. 443, 457 (2011); *Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the *public* expression of ideas may not be prohibited merely because the ideas are themselves offensive to their hearers."); *see generally* Robert C. Pose, *The Constitutional Concept of Public Discourse*, 103 Harv. L. Rev. 601 (1990).

especially warranted here. The complaint alleges with particularity that official data show there has been *no* known protester violence or harassment in San Diego for decades at any facility the ban covers—an allegation the city never contests, arguing only that under *Hill* it does not need any evidence. *Contra N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see also Brown*, 586 F.3d at 279-80 (refusing to defer to city council's unevidenced assertion buffer zone would advance public safety).

### D.     The ordinance is not narrowly tailored.

A speech restriction is not narrowly tailored if there are "less restrictive alternatives … at least as effective in achieving" its stated purpose. *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023); *see Schenk*, 519 U.S. at 362-63, 369. Such "narrow tailoring" is the very touchstone of government regulation when freedom of expression is at stake. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980). A statute that prohibits a substantial amount of protected speech relative to its plainly legitimate sweep must be struck down. *See Green v. Miss U.S.A., LLC*, 52 F.4th 773, 800 (9th Cir. 2022).

Less restrictive alternatives abound under local, state, and federal law to prevent obstruction of abortion clinics. The San Diego Municipal

Code gives city police broad authority to break up crowds gathered on city sidewalks. *See* San Diego Mun. Code § 82.29. Obstructing an abortion clinic has been a crime in California for decades, with violators subject to a $25,000 fine and a year in prison. Cal. Pen. Code § 423.2(a) & (c); *id.* § 423.3(a)-(b) & (d)-(e). And even absent a federal constitutional right to abortion, *Isaacson v. Mayes*, 84 F.4th 1089, 1095 (9th Cir. 2023), federal law prohibits obstructing clinic entrances. *See* 18 U.S.C. § 248(a)-(b).

Many generally applicable laws also prevent obstructions sans speech bans. If a protestor steps onto clinic property, he can be arrested for trespass. *See* Cal. Pen. Code § 602(o). If he is part of a sidewalk crowd that does anything illegal or does something legal "in a violent, boisterous, or tumultuous manner," he can be arrested for unlawful assembly. *See id.* §§ 407, 409. If a police officer tells him to leave because the officer thinks he is disturbing the peace, he can be arrested if he stays. *See id.* § 416(a). If he engages in undefined "disorderly conduct," he can find himself in handcuffs. *See* San Diego Mun. Code § 56.27. Et cetera.

Less restrictive alternatives likewise exist to prevent harassment and intimidation of passersby. If a protestor diverts a passerby from her path, he can be arrested. *See* Cal. Pen. Code § 423.2(c). If he intimidates

63

or interferes with her while not diverting her from her path, he can be arrested. *See* 18 U.S.C. § 248(a)(1). If he threatens her, he can be arrested, *see* Cal. Pen. Code § 422(a); "interferes" with her abortion rights, arrested, *see id.* § 422.6(a); Cal. Const. § 1.1; does any of this chauvinistically, be subject to a sentencing enhancement for a hate crime. *See id.* §§ 422.7, 422.75.

Even if those laws did not exist, the ban still would not be narrowly tailored. A narrowly tailored speech ban "targets and eliminates no more than the exact source of the evil it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (marks omitted). That means that a speech-restricting law is not narrowly tailored if it either (1) "only marginally, if at all, promotes the city's asserted interest"; or (2) "applies, on its face, to an extraordinarily broad group of individuals, the vast majority of whom are not responsible for the evil [the government] seeks to remedy." *Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) (en banc).

The challenged ordinance suffers from both fatal defects. First, it does nothing to advance public safety. Even accepting as true the three anecdotes offered at the city council meeting, the ordinance would fail to eliminate those or similar evils. Pro-lifers allegedly harassed clinic

64

employees over a back fence and when they went to the mailbox across the street. But both locations lie outside the buffer zone the ordinance creates. Similarly, none of the activity of Antifa agitators who supposedly held up their banner down the street from the downtown clinic would have been covered by any part of the ordinance.

Second, the ordinance sweeps in an extraordinarily broad group of individuals—almost none of whom poses any threat to public safety. It applies to anyone within 100 feet of a health care facility, school ground, or place of worship across the city no matter how peaceful they are. Blunt instruments like this are why the Supreme Court has "noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures," in order to ensure the burden "restricts no more speech than necessary." *McCullen*, 573 U.S. at 492.

This Court has made clear that it will strike down as facially unconstitutional "municipal ordinances … [that] seek to prohibit such a broad range of protected conduct." *Lone Star Security & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1197 (9th Cir. 2016). And multiple of its sister circuits applying *Hill* already have deemed far less geographic overbreadth constitutionally fatal to similar buffer zones. *See, e.g.*,

65

*Sisters for Life,* 56 F.4th at 405; *Reynolds v. Middleton*, 779 F.3d 222, 231-32 (4th Cir. 2015).With *Hill* set aside, there can be no dispute the bubble zone here contains the same fatal defects.

Finally, the bubble zone leaves no adequate alternative channels of communication (even under the *lower* bar of intermediate scrutiny), given that sidewalks "remain one of the few places where a speaker can be confident that he is not simply preaching to the choir." *McCullen*, 573 U.S. at 476. An ability to spread one's views via traditional media or the Internet does not adequately replace a lost opportunity to do so in person because someone "can always turn the page, change the channel, or leave the Web site." *Id.* And that inadequacy especially holds true when, as here, the only way to reliably identify or converse face-to-face with abortion-minded women is on public sidewalks near the clinics. *See Santa Monica Nativity Scenes Cmte. v. City of Santa Monica*, 784 F.3d 1286, 1298 (9th Cir. 2015).

The district court's contrary ruling presumed *Hill* is still good law. It is not. Accordingly, the bubble zone violates the First Amendment's normal protections against facially content-based restrictions on protected speech and easily fails strict scrutiny.

66

## V.   A Preliminary Injunction Should Issue.

The district court dismissal of Lopez's motion for preliminary injunction as moot should likewise be reversed. Further, given the high likelihood of Lopez's success on the merits, this Court should also remand with instructions to grant Lopez's preliminary injunction motion.

To obtain a preliminary injunction, a movant must show (1) "he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tip in his favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Lopez satisfies all four factors here.

**Likelihood of success on the merits**: Lopez is likely to succeed on the merits for nearly all the same reasons already discussed: (a) the ordinance's harassment and offensive noise provisions are facially vague and overbroad as a matter of law; (b) the challenged restrictions, both individually and in tandem, lack narrow tailoring as a matter of law; (c) the ordinance is content based because its exception for clinic employees, agents, and volunteers facially discriminates based on speaker, its 8-

67

foot bubble restriction was adopted for a viewpoint discriminatory purpose, and its offensive noise provision is content-based on its face as a matter of law; and (d) given the Supreme Court's abandonment of *Hill*, the bubble zone is facially content-based. Further, none of these restrictions can survive even intermediate scrutiny.

**Irreparable harm**: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, Lopez's likelihood of success on the merits of his First Amendment claims confirms he is suffering ongoing irreparable injury absent a preliminary injunction.

**Public interest and balance of harms**: There is a "significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). Indeed, the government "has no legitimate interest in enforcing an unconstitutional" law. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Thus the public interest and balance of harms likewise favor a preliminary injunction.

This Court should thus remand with instructions to grant Lopez's motion for preliminary injunction. At minimum, it should remand with instructions to reconsider that motion.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's dismissal order and remand with instructions to grant Lopez's motion for preliminary injunction, or otherwise reverse and remand for further proceedings.

Respectfully submitted,

Dated: June 12, 2025

By: s/ Peter Breen

Peter Breen
Michael McHale
Christopher J.F. Galiardo
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel.: (312) 782-1680
pbreen@thomasmoresociety.org
docketing@thomasmoresociety.org

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel.: (858) 759-9930
pjonna@limandri.com

*Counsel for Plaintiff-Appellant*

69

## STATEMENT OF RELATED CASES

Plaintiff-Appellant is unaware of any related cases currently pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2025, I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

s/ *Peter Breen*
Peter Breen
*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-2162

I am the attorney or self-represented party.

**This brief contains** | 13,407 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [           ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Peter Breen | **Date** | 06/12/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**        *Rev. 12/01/22*

APPEAL NO. 25-2162

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

ROGER LOPEZ,

,

*Plaintiff-Appellant,*

v.

CITY OF SAN DIEGO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:24-cv-01577-LL-DDL

---

**ADDENDUM TO OPENING BRIEF OF APPELLANTS**

---

Peter Breen
Joan M. Mannix
Michael McHale
Christopher J.F. Galiardo
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel.: (312) 782-1680
pbreen@thomasmoresociety.org
docketing@thomasmoresociety.org

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel.: (858) 759-9930
pjonna@limandri.com

# ADDENDUM TABLE OF CONTENTS

U.S. Constitution Amendment I ................................................................ A-1

U.S. Constitution Amendment XIV ........................................................ A-1

42 U.S.C. § 1983 ........................................................................................ A-1

28 U.S.C. § 1331 ........................................................................................ A-2

28 U.S.C. § 1291 ........................................................................................ A-2

28 U.S.C. § 1292 ........................................................................................ A-2

San Diego Municipal Code § 52.1001 *et seq.* ........................................ A-5

## U.S. Constitution Amendment I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## U.S. Constitution Amendment XIV

Section 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

## 42 U.S.C. § 1983
## Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought

A-1

against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## 28 U.S.C. § 1331
## Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C. § 1291
## Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. § 1292
## Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

    (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying,

refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

[…]

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

(2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d)

(1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an

A-3

appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4)

      (A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

      (B) When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion,

A-4

proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out.

## San Diego Municipal Code § 52.1001¸ *et seq.*

### §52.1001   Purpose and Intent

The Council finds that every person in the City of San Diego has a constitutional right to privacy in accessing healthcare, including reproductive healthcare, to exercise religion, and to access equal educational opportunities, and that intentional efforts to harass or prevent a person from exercising these rights are contrary to the interests of the people of San Diego. The Council further recognizes that every person in the City of San Diego has the constitutional right to assemble peaceably and to exercise free speech rights. It is the purpose of this Division to strike a balance between protecting the rights of those who seek access to healthcare, to practice their religion, and access educational services, while also protecting the rights of those who wish to express themselves.

### §52.1002   Definitions

For purposes of this Division, defined terms appear in italics. The following definitions apply:

*Consent* means to give permission through words or acts to what another person proposes through words or acts.

*Entrance* and *exit* mean any door, gate, opening, or intersection of the public right-of-way and a private walk or path leading to a *health care facility, place of worship,* or *school grounds,* used by persons to gain

access to or leave the premises of a *health care facility, place of worship,* or *school grounds.*

*Harass* and *harassment* mean engaging in a knowing and willful actions [sic] or course of conduct directed at a specific person or persons that would seriously alarm or aggravate, cause substantial distress to, *intimidate,* terrorize, threaten, or torment a reasonable person. *Harassment* does not include consensual conversations or displaying a sign from more than eight feet away from a person or persons. *Harassment* includes approaching or following a person with the intent to *harass* once the person has indicated they do not want to be approached or followed; intentionally touching or causing physical contact with a person without that person's *consent;* and using violent or threatening gestures toward a person.

*Health care facility* means any medical or health facility, hospital, or clinic within the City that is licensed as a health care facility under state law or any building, office, or other place within the City regularly used by any health care provider licensed under California law to provide medical, nursing, cow1seling, referral, information, or advice to patients.

*Intimidate* means use of credible threats of violence, oppression, or coercion with the intent to prevent a person from accessing a *health care facility, place of worship, school grounds,* or a *parking lot.*

*Obstruct* means making ingress to or egress from a *health care facility, place of worship, school grounds,* or a *parking lot* impassable or unreasonably difficult or hazardous. *Obstruct* includes intentionally blocking or interfering with the safe or free passage of pedestrians or vehicles by any means, intentionally causing a pedestrian to take evasive action to avoid physical contact, and placing signs, tables, chairs, or other objects in a manner that blocks the flow of pedestrian traffic.

*Parking lot* means property owned, leased, occupied, or otherwise held out to the public by a *health care facility, place of worship,* or school as a place where a person can park a vehicle for the purpose of accessing the *health care facility, place of worship,* or *school grounds.*

A-6

*Place of worship* means a place in which religious worship, as defined under California law, is conducted.

*School grounds* means the building or buildings set aside for purposes of giving instruction on those courses of study required by the California Education Code or maintained pursuant to standards set by the State Board of Education, or in which such instruction is actually given, plus any grounds surrounding the school that are enclosed by a fence, wall, hedge, or other manner of enclosure. *School grounds* does not include the grounds associated with a vocational or professional institution of higher education, including a community or junior college, college, or university and does not include a private residence where home schooling activities occur.

§52.1003  Establishment of Buffer Zone at Entrances and Exits to Health Care Facilities, Places of Worship, and School Grounds

(a) Obstructing Access. No person shall *obstruct* an *entrance* or *exit* or access to a *parking lot* at a *health care facility, place of worship,* or *school grounds.*

(b) Harassment and Intimidation Prohibited. Within a radius of 100 feet of a *health care facility, place of worship,* or *school grounds,* no person shall:

> (1) approach within eight feet of a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility, place of worship,* or *school grounds* to *harass* or *intimidate* that person; or

> (2) *harass* or *intimidate* a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility, place of worship,* or *school grounds.*

(c) Consent Required. Within a radius of 100 feet of a *health care facility, place of worship,* or *school grounds,* unless the person or motor vehicle occupant *consents,* no person shall:

A-7

(1) knowingly and willfully approach within eight feet of a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility, place of worship,* or *school grounds,* to:

(i) pass a leaflet or handbill to that person;

(ii) display a sign to that person; or

(iii) engage in oral protest, education, or counseling.

(2) knowingly and willfully approach within eight feet of an occupant of a motor vehicle seeking to enter or exit a *parking lot,* to:

(i) pass a leaflet or handbill to the motor vehicle occupant;

(ii) display a sign to the motor vehicle occupant; or

(iii) engage in oral protest, education, or counseling.

(d) Measuring Eight Feet. For purposes of this Division, eight feet shall be measured from the extension of the body of the person seeking to enter or exit a *health care facility, place of worship,* or *school grounds* or the exterior of the occupied motor vehicle seeking to enter or exit a *parking lot to* the extension of the body of, or any sign or object held by, another person.

(e) Measuring 100 Feet. For purposes of this Division, 100 feet shall be measured from the main entrance door, or if the property is fenced and gated then from the main entrance gate, of the *health care facility, place of worship,* or *school grounds.*

(f) Exemptions. Section 52.1003 does not apply to:

(1) law enforcement or public safety officials acting in the scope of their employment; and

A-8

(2) employees, agents, or volunteers of the *health care facility, place of worship,* or school or school district operating on *school grounds* acting within the scope of their employment, agency, or volunteer service.

## §52.1004   Noise Limitations

(a) Within a radius of 100 feet of a *health care facility, place of worship,* or *school grounds,* no person shall:

(1) make, or cause to be made, any disturbing, excessive, or offensive noise which causes discomfort or annoyance to any reasonable person of normal sensitivities; or

(2) make, or cause to be made, any noise which unreasonably interferes with the workings of a *health care facility, place of worship,* or school; or

(3) use loud speaking amplifiers or similar devices in a manner that emits a sound level exceeding 55 decibels any point ten feet or more from the noise source.

(b) Section 52.1004 applies from one hour before until one hour after the posted business hours of the *health care facility, place of worship,* or school.

(c) This prohibition does not apply when loud speaking amplifiers are operated by law enforcement or public safety officials acting in the scope of their employment.

## §52.1005   Signage

Nothing in this Division shall prevent a *health care facility, place of worship,* or school or school district operating on *school grounds* from posting signage on property under its control stating the requirements of this Division. Posting signage is not required for this Division to be effective or enforceable. Signage shall comply with any other applicable requirements of this Municipal Code.

A-9

§52.1006   Remedies

(a) Any person who is aggrieved by an act prohibited by sections 52.1003 or 52.1004 may bring an action for damages, injunctive or declaratory relief, as appropriate, in a court of competent jurisdiction against any person who has violated or has conspired to violate its provisions. An aggrieved person includes any *health care facility, place of worship,* or school or school district operating on *school grounds.*

(b) Any aggrieved person who prevails in an action brought under section 52.1006(a) shall be entitled to recover from the violator those actual damages, costs, attorneys' fees and such other relief as determined by the court. In addition to all other damages, the court may award to the aggrieved person a civil penalty of up to $2,500 for each violation.

(c) The remedies provided by section 52.1006 are in addition to any other legal or equitable remedies the aggrieved person may have and are not intended to be exclusive.

(d) Any violation of section 52.1003(a) or (b) shall constitute a misdemeanor. A first conviction for violation of section 52.1003(a) or (b), shall be punishable by a fine of not more than $500 or by imprisonment in the County Jail for a period of not more than three months, or by both fine and imprisonment. Each subsequent conviction for violation of section 52.1003(a) or (b) shall be punishable by a fine of not more than $1000 or by imprisonment in the County Jail for a period of not more than six months, or by both fine and imprisonment.

(e) A law enforcement official may order any group of two or more persons who continue to violate this Division after a verbal warning to move to an area at least 100 feet away from any *entrance* or *exit* to a *health care facility, place of worship,* or *school grounds.* Section 52.1006(e) shall apply from one hour before until one hour after the posted business hours of the *health care facility, place of worship,* or school operating on *school grounds.*

A-10